## Curd's Administratrix v. Cincinnati, New Orleans & Texas Pacific Railway Company.

(Decided February 24, 1915.)

### Appeal from Jessamine Circuit Court.

1. Railroads—Trespassers—Lookout Duty.—Those in charge of a railroad train owe no lookout duty to a trespasser upon a railroad bridge or trestle; all they are required to do is, after actually discovering his peril, to exercise ordinary diligence to avoid injuring him.

2. Railroads—Trespassers—Lookout Duty.—The mere acquiesconce upon the part of a railroad company cannot be construed into a promise that its bridge may be used by foot-passengers as a highway so as to entitle them to a lookout duty or make them, while using it in such a manner, anything but trespassers.

EVERETT B. HOOVER for appellant.

N. L. BRONAUGH, R. A. THORNTON and JOHN GALVIN for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE MILLER— Affirming.

This action was brought by L. P. Curd's administratrix to recover damages from appellee, the defend-.

ant below, for negligently causing the death of said Curd; and the trial court having directed a verdict for the defendant at the close of the evidence, the plaintiff appeals.

Curd was struck by one of appellee's trains on December 31st, 1912, and died on February 12th, 1913. He was 68 years old, and, for some time before the accident, he had been employed at a rock crusher located in the town of High Bridge, on the north side of the Kentucky River, in Jessamine County. Appellee's railroad bridge, known as High Bridge, spans the Kentucky River at that point.

The town of High Bridge has three or four hundred inhabitants. It is located upon either side of the track, the larger number of inhabitants being upon the west side. The rock crusher where Curd worked was located several hundred yards north of the bridge. The railroad depot was located on the east side of the railroad, near the bridge. The postoffice was on the west side of the railroad, and nearly opposite the depot building, and between this depot and the postoffice there was, at the time of the accident, a fill under the railroad track about 30 feet high. At the south end of the fill next to the river a public road passed under the north end of the bridge. This road led from the postoffice on the west side of the fill around under the north end of the bridge to the depot on the east side. At the top of the fill, immediately above the depot, there was a shed and platform where passengers boarded and alighted from appellee's trains, and a pathway ran obliquely down the side of the fill from the platform and shed to the depot at the bottom of the fill. The fill extended north of the platform and shed several hundred feet in the direction of the rock crusher.

The present bridge and the trestle which carries the train from the bridge to the mainland were built within the last few years. The old bridge was built on the grade and was about 35 feet lower than the new or present bridge. In building the new bridge thirty-five feet above the old bridge it became necessary to connect the end of the bridge with the mainland by a trestle several hundred feet long. For the purpose of improving the roadbed appellee had begun filling the space below the trestle so as to eventually make it a dirt fill, instead of a trestle.

At the time of the accident the dirt fill did not reach up to the track, thus leaving the track sustained entirely by the wooden trestle, which was about 300 feet long. There was no walkway upon the trestle for pedestrians, and no provision of any kind for any use of it by the public. The cross-ties were the only things upon which one could walk between the rails, and the trestle was not sufficiently wide to permit a person to occupy it while a train was passing over it.

At the north end of the trestle there was a caution board warning people not to trespass thereon; and at or near the shed where passengers boarded the trains there was another like caution board.

On the east side of the main track, and at the bottom of the fill, there is a side-track on level ground extending from the depot to a point some two or three hundred yards north, where a pathway had been made over the railroad track from the east to the west side. Along the west side of the main line, and below the trestle work, is another path running from the platform to the office of the crusher plant.

There is also some proof to the effect that there was a path leading up from the fill on the west side, from near the postoffice, to a point near the platform at the top of the fill.

Curd lived on the west side of the trestle. He left his home shortly after dinner to go to the postoffice, although no witness saw him at the postoffice. He was first seen by one of the witnesses as he was leaving the platform at the top of the fill, walking on the trestle northwardly, toward the rock crusher.

After extending northwardly from the bridge in a straight line for several hundred yards, the railroad track curves sharply to the east. Going south there is a heavy down grade for two or three hundred yards north of the place of the accident; but from that point there is an up grade to the bridge.

When Curd had reached a point on the trestle about 200 feet north of the platform appellee's passenger train No. 15, known as the "Ohio Special," going south, and running at a speed of from 15 to 25 miles an hour, rounded the curve at the northern end of the village. Curd attempted to stand on the east end of the cross-ties on the trestle work so as to avoid being struck by the engine; but the space was too narrow, and Curd was

knocked from the trestle to the ground below. The train was a through train, and was not scheduled to stop at High Bridge; and while its engineer and fireman admit they did not give any warning, by whistle or otherwise, at or near the point where Curd was struck, the engineer says he did give the usual signal for High Bridge by two long and two short blasts of the whistle at the telegraph office further up the road.

Furthermore, neither the engineer nor the fireman saw Curd upon the track at any time, and did not know the train had struck him until they were so informed later in the day. They explained their failure to see Curd by the fact that the fireman was "down in the deck" feeding the engine with coal, with his back toward the front of the engine, while the engineer was sitting at his post on the right or west side of the engine, and could not see Curd while rounding the curve, because his view of the point on the trestle where Curd was standing was completely obstructed by the boiler of the engine. The engineer and the fireman are positive in their statement that they did not see Curd at any time, and there is no evidence whatever tending to contradict either of them.

Appellant's theory of this case is, that appellee owed Curd a lookout duty, under the circumstances, and that it failed to perform that duty. On the other hand, the theory of the appellee is, that Curd was a trespasser on its track, to whom it owed no lookout duty, but only the duty to use ordinary care to avoid injuring him after his presence upon the trestle was discovered by those in charge of the train. It is a well established rule that the mere use of a railroad track by the public does not convert the users from trespassers into licensees, unless its use is at a place where the public have a right to go and be, as at a public crossing, or the like; or unless it is in a city, town, or populous community, where large numbers of people use the track, thereby putting upon the company the duty of anticipating their presence upon the track, and the use of ordinary care to avoid injury to them. Adkins' Admr. v. Cumberland R. R. Co., 147 Ky., 32.

If Cur was a trespasser, appellee did not owe him any lookout duty; but, if he was a licensee, it did.

In order to show that Curd was a licensee appellant attempted to show that the trestle in question had been used generally by the people of High Bridge as a foot-

way, with the consent of the railroad company, thereby bringing the case within the rule above stated, that where a railroad company permits its tracks to be used by such a number of people as would lead it to anticipate the presence of persons upon the track, they become licensees to whom a lookout duty is due. This theory, however, assumes not only that a sufficiently general use of the trestle by the pedestrians has been shown, but also that a trestle or bridge stands upon the same footing as an ordinary roadbed.

We are aware that in some jurisdictions it has been held that a railroad company is liable to a trespasser on its trestle without ability to save himself from injury, if those in charge of the train discovered, or, by the exercise of ordinary care, might have discovered, the peril of the injured person, and might, by the exercise of ordinary care, have avoided the accident. Bogan v. Carolina Central R. Co., 129 N. C., 154, 55 L. R. A., 418; Roberts v. Louisiana Railway & Navigation Co., 132 La., 446, Ann. Cas., 1914 D., 1207.

But the rule announced by the Supreme Courts of North Carolina and Louisiana has not been adopted in this State; on the contrary, it has been repeatedly held by this court, and in most other jurisdictions, that the mere acquiescence upon the part of a railroad company cannot be construed into a promise that its bridge may be used by foot passengers as a highway, so as to entitle them to a lookout duty or make them, while using it in such a manner, anything but trespassers.

In the operation of its trains over trestles a railroad company is entitled to a clear track in order that its public functions may be carried out properly.

In Smith's Admr. v. I. C. R. R. Co., 28 Ky. L. R., 723, 90 S. W., 254, the appellant was struck and killed while she was walking on and near the middle of a railroad trestle about 400 feet long and 20 feet high. Her administrator sued the company to recover damages, but, in denying the plaintiff any relief, this court said:

"The evidence, without contradiction, showed that the decedent was a trespasser upon the railroad bridge of appellee, and the trial judge properly held her personal representative to all of the consequences flowing from her being wrongfully upon it. The employes of the corporation owed her no lookout duty whatever. All they were required to do was, after actually discovering

her peril, to exercise ordinary diligence to stop the train in order to avoid injuring her. This proposition of law has been so often decided, and so uniformly upheld, that it is now quite beyond question. The railroad had the exclusive right to the use of its line at all points save those where the public had a right to be, and was under no duty to anticipate the presence of trespassers.''

In Prince v. I. C. R. R. Co., 30 Ky. L. R., 469, 99 S. W., 293, the appellant, Fannie Prince, was knocked from a small bridge in the company's switch yard in Paducah. In that case, as in this, there was a sign at the end of the bridge warning persons to ''keep off.'' In that case the plaintiff was treated as a trespasser upon the company's bridge, and not entitled to recover damages for her injury.

Again, in L. H. & St. L. R. R. Co. v. Woolfork, 30 Ky. L. R., 569, 99 S. W., 294, Woolfork was injured while he was walking across appellant's railroad bridge within the corporate limits of the city of Henderson, although in a part of the town that was sparsely settled. The bridge was not adapted to the use of pedestrians; it had no footway plank; and, as in the case at bar, those who used it stepped from one cross-tie to another. Woolfork recovered a verdict for $500.00; but this court reversed the judgment, saying that Woolfork was a trespasser at the time he was injured, and that appellee owed him no lookout duty whatever; but that, after his peril was actually discovered, those in charge of the train were bound to exercise reasonable diligence to avoid injuring him.

A significant portion of the opinion, which is directly applicable to the case at bar, reads as follows:

''We think the court erred in admitting testimony that a great many people habitually trespassed upon appellant's trestle, making of it a passway. These persons were trespassers, and, as a practical proposition, the railroad has no remedy against such trespassers. The public cannot acquire a right in the private property of a railroad by repeated wrongs. If this could be done, then the railroad's tracks, bridges, and trestles would be at the mercy of habitual wrong-doers, and the corporation largely deprived of its property rights for public use without the compensation provided by the Constitution.

"The reasoning which requires railroad corporations to exercise a lookout duty when their tracks cross the streets of cities or towns at grade, or constitute a part of the highway of municipalities or thickly settled places or communities, has no place in the case at bar. A lookout duty is imposed upon the corporations in the class of cases mentioned because the public have a right to cross and be on their roadway, and, therefore, they must use due care not to injure those who are exercising their lawful rights in the premises."

Without further elaboration, it is sufficient to say that the doctrine above announced has been applied by this court in Becker v. L. & N. R. R. Co., 110 Ky., 474; 96 Am. St. Rep., 459, 53 L. R. A., 267; Vanarsdell v. L. & N. R. R. Co., 23 Ky. L. R., 1666, 65 S. W., 858; Flint v I. C. R. R. Co., 28 Ky. L. R., 1, 88 S W., 1055; Beiser v. C. & O. Ry. Co., 29 Ky. L. R., 249, 92 S. W., 928; C. & O. Ry. Co. v. Barbour, 29 Ky. L. R., 339, 93 S. W., 24; and Cummings' Admr. v. I. C. R. R. Co., 33 Ky., L. R., 584, 110 S. W., 809.

The cases from other jurisdictions sustaining the rule above stated are collected in the note in Ann. Cas. 1914 D., 1211.

Curd, being a trespasser, to whom the company owed no lookout duty, the only question before the trial court was, whether those in charge of appellee's train exercised reasonable diligence to avoid injuring Curd after his peril was actually discovered; and, as there was no testimony whatever that he was seen at any time by either the engineer or the fireman, the peremptory instruction to find for the defendant was properly given.

Judgment affirmed.