## Chesapeake & Ohio Railway Company v. Stephens' Administrator.

(Decided March 1, 1916.)

### Appeal from Floyd Circuit Court.

1. Railroads—Trespasser Upon Railroad Bridge.—One who has no business with the railroad, which requires him to do so, and is not an employee of the railroad company, but who, for his own convenience or pleasure, goes upon and travels upon a railroad bridge is a trespasser, and the rules of law, which apply to a trespasser, apply to him.

2. Railroads—Trespasser Upon Railroad Bridge.—The ones operating a railroad train not being required to anticipate the presence of any one upon a railroad bridge, are not required to keep any lookout for him nor give any signals of the approach of the train for his benefit, and the only duty which they owe him is the humane duty of exercising ordinary care to avert injury to him after his presence upon the bridge has been discovered by them.

3. Railroads—Use of Bridge as Footway—Acquiescence—Trespassers. —Mere acquiescence by the railroad company in the use of its bridge by persons who use it as a footway, without the consent and against the wish of the railroad company, can not be construed into permission to use the bridge in that way, and does not change the status of one who makes such use of the bridge from a trespasser to a licensee.

HARKINS & HARKINS, WORTHINGTON, COCHRAN & BROWNING and F. T. D. WALLACE for appellant.

MAY & MAY for appellee.

OPINION OF THE COURT BY JUDGE HURT—Reversing.

On the 25th day of November, 1913, certain employes of the appellant were engaged in the construction of the Elkhorn and Beaver Valley Railway, which connects with

the main line of the appellant's railroad, near where it crosses over Beaver, which is a tributary of the Sandy River, in Floyd county. The main line of appellant's road, which runs from Ashland up the Sandy River, passes over a bridge over Beaver, near to where it empties into the river. At this point, on the east side of Beaver, is situated a village, known as Allen. It is an incorporated town and the railroad bridge over Beaver is within the limits of the town. The railroad depot at Allen is about two hundred yards east of the Beaver. The appellant has three tracks at this point, one of which is the main line and the others are used for side tracks and switching purposes. There is a switch about one hundred feet from the east end of the bridge over Beaver. The main street of the town extends from Beaver alongside the tracks eastward and passes the depot, in that direction. Near Beaver and on the opposite side of the railroad from the main portion of the town was a boarding house, and the inmates of this house crossed the railroad track at a point between the switch stand and the east end of the bridge in going to and from the boarding house into the main portion of the town. In former years, when the river was navigated by steamboats, there was a landing, to arrive at which persons passed over this crossing, but it seems not to have been used for this purpose since the building of the railroad twelve or thirteen years ago, and the way is now obstructed by a gate across it, near the line of the right of way of the railroad. It does not appear from the record how many persons resided in Allen, ordinarily, but, at the time mentioned above, the construction of the Elkhorn and Beaver Valley Railway being under way, and for other reasons, the population of Allen was near five hundred persons. The record fails to show how far it is from the junction of the Elkhorn and Beaver Valley Railway, with the main line of appellant to the west end of the railroad bridge over Beaver, but west of the junction and about one mile west of the bridge is a station, which is called Dwale; and along the railroad track, but at what distance it does not appear, to the west of the bridge over Beaver is a store house, a dwelling and a house of appellant's for its employes. A bridge erected by the county for the use of the traveling public over Beaver is in close proximity to the railroad bridge, but from the evidence it cannot be said that it had then been

completed, or was fitted for travel, except that persons on foot could pass over it. Near this point there were places where the public had formerly and to some extent, at the time mentioned, forded Beaver in traveling, but these fords seem to have suffered from obstructions, and had passed into disuse to a large extent. Because the railroad bridge was a more direct route of travel, the citizens of Allen and many who had occasion to go to and from Allen, over Beaver, used the railroad bridge as a footway, although the appellant had warnings posted at each end of the bridge, by which persons were forbidden to pass over the bridge and were warned not to do so. They, however, disregarded the wishes of the railroad authorities and continued to use the bridge as a footway, according to the evidence of the different witnesses, in large numbers. No injuries seem to have been suffered by any one from this use of the bridge, until James Stephens lost his life, on the 25th day of November, 1913. He was a resident of Allen, and was a man of about fifty years of age. Industrious, ordinarily, he had been seen to be intoxicated on several occasions during the two weeks just preceding his death, and on the day of his death he was in the vicinity of a crew of appellant's employes, who were operating a train in the construction of the Elkhorn and Beaver Valley Railroad, and at a point about three or four miles up the Beaver from the junction of that road with appellant's main line, and was then in an intoxicated condition; and when about five o'clock in the evening they were proceeding to their camp near Allen, he got aboard their train and was required by them to get off of it, twice, because of their fear of his receiving injuries on account of his condition. One time he had, without permission, gotten upon the engine, and at another time was found by the brakeman sitting upon a car, with one foot upon a car and the other hanging down between the cars. About one mile from the junction was the last time he was seen by the employes of appellant upon their train. The train consisted of an engine, with next to it a caboose, and following it ten or eleven empty coal cars of different types. When the train arrived at the junction it was after nightfall, and a number of camp cars were upon the track. The conductor sent a flagman in the direction of Dwale, and another in the direction of Allen, upon the main line. The train then pushed the camp

cars out upon the main track, and in the direction of Dwale, until the train got upon the main track, when the conductor, with a lantern, took a position upon the rear car, and then the train was backed to the bridge and over it, but when the car, upon which the conductor was, had arrived at the east end of the bridge, the train. was stopped and the conductor went forward to the switch, which, as said, was about one hundred feet away, and opened the switch when the train was moved further backward, until the engine was between the bridge and switch. The brakeman, who had been sent ahead of the train into Allen, had proceeded to the depot, and when the train arrived he then joined the conductor near the switch stand, when the crew engaged for about an hour in placing cars upon the different tracks, and in so doing the engine and attached cars went forward toward the west several times and then back toward the depot, and in so doing passed across the bridge or over some parts of it. After this had occurred several times the decedent was discovered in a mangled condition, with life extinct, lying beside the railroad track, upon the east end of the bridge. One arm and one leg were severed from his body, and he was otherwise bruised and mangled. Blood, particles of flesh, and clothing, and articles, which were his property, were found upon the ties of the bridge, from the body and extending back toward the western end of the bridge for about half the width of the bridge. Upon the wheels of four of the cars blood and particles of flesh were observable. There were no signs of blood or anything to indicate that it had come into contact with the body upon the engine. The only evidence given as to the portion of the train, which the cars occupied, which had blood upon the wheels, was that given by the fireman, who testified that they were in the rear of the caboose, which was next to the engine, and near the middle of the train. When passing over the bridge the persons on the train testified to having felt a slight jar, as occurs when the wheels of a locomotive pass over a stick or clod upon the track, and that the fireman remarked that they had run over something upon the bridge. The witnesses, however, and there were two or three on the engine, besides the engineer and fireman, disagree as to which trip it was across the bridge that this occurred, and it is not made satisfactory as to which time, in passing over it, it occurred, and as

to whether it was when the engine was going forward or backward. It does not appear that the persons operating the train gave any warning of its movements or approach by blowing the whistle or ringing the bell, during the entire time of their operations. The headlight of the engine would enable the engineer to see objects upon the track in front of him for a distance of one hundred feet. After the first time the train was backed over the bridge no light was exposed upon the car which was farthest to the rear of the engine, when the train was backed over the bridge, but the proof fails to show that the rear car ever passed off the bridge when the train was moving to the westward. No evidence is given, which sheds any light upon the manner of decedent's death, except that his body was run over upon the bridge. No one pretends to have seen the decedent from the time the brakeman testifies to his getting off the train, about one mile from the junction, and going toward the rear of the train, until his body was found upon the east end of the bridge.

This action was instituted by the administrator of decedent to recover the damages alleged to have been suffered by his estate by reason of his death. The cause of action was based, in the petition, upon general allegations of negligence upon the part of the ones operating the train which caused decedent's death. Afterward, by an amended petition, it was specifically alleged that the decedent, at the time of his death, was crossing Beaver, upon the bridge; that at that time and for years before the bridge had been used for travel on foot by a large number of citizens of Allen and the surrounding country, and with the knowledge and with the acquiescence of the appellant, and that it was a place at which the presence of persons traveling upon it was to be anticipated; that the place at which he was struck and killed was near a public crossing, at which the presence of persons upon the track was to be anticipated and expected, at all times; that the servants of appellant negligently backed the train across the bridge and street crossing without giving any warning of its approach and without keeping any lookout, and that said negligence caused decedent to lose his life.. In the original petition it was alleged that the servants of appellant knew of the use of the bridge by the public, and knew of the.

presence of decedent upon it, or by the exercise of ordinary care could have known it.

The appellant traversed the allegations of the petition and amended petition, and in addition alleged the contributory negligence of decedent as a defense.

The trial resulted in a verdict by the jury and judgment of the court in favor of appellee.

The appellant's grounds and motion for a new trial being overruled, it has appealed.

The grounds relied upon for reversal are: (1) The error of the court overruling the motion of appellant for a direct verdict in its favor at the conclusion of appellee's testimony, and at the close of all the testimony; and (2) the error of the court in giving to the jury instructions 1, 2a, 4 and 5. The first ground will be first considered.

There is no evidence which remotely tends to prove that the engineer, fireman, brakeman, conductor, or for that matter, any one else, had any knowledge of the presence of decedent upon the bridge, before the time the body was found lying upon the end of the bridge. The amended petition alleges that he was upon the bridge at the time the train came in contact with him, and all of the evidence tends to the same conclusion, and precludes the possibility of the train coming in contact with him at any other place. If those operating the train did not see him, nor have any knowledge of his being there, in a position of peril, in time, by the exercise of ordinary care upon their part to have prevented injury to him, or unless he had a right or was licensed to be upon the bridge, they nor their employes could be culpable unless their want of knowledge of his presence arose from the neglect of some duty, which they owed to him, or their neglect of some duty which they owed to him prevented him from escaping the injury. It is true, as contended for appellee, that it is the duty of those operating railroad trains to give warning of the approach of the train, to operate them at a reasonable rate of speed, and to maintain an adequate lookout for persons upon the track, whenever the presence of persons who used the tracks as a matter of right or as licensees must be anticipated. It is true, that where the railroad tracks extend along or across the streets of towns and cities and at crossings and at points on the road in towns, cities and populous communities, where

the public generally have been in the habit of using the tracks and right of way, with the knowledge and consent of the railroad company, are places where the presence of persons upon the tracks must be anticipated, and those operating the train owe the duties of regulating the speed of the train so as to have it under control, to give warning of its approach, and to maintain an adequate lookout for persons upon the track, so as to avoid injury to them. In such states of case, the rule applies, that owing such persons the duty of giving warning of the approach of the train and maintaining a lookout for them, and having the train under control, the ones operating the train are held to be negligent if they fail to see persons upon the track, when, by the exercise of ordinary care, they could have seen them and known of their presence. A different rule has, however, uniformly been held to apply to persons who are not employes of the railroad, and have no business with the railroad, which requires them to do so, and who go upon a bridge of the railroad for their own convenience or pleasure. Such persons have uniformly been held to be trespassers, and the rules, which apply to trespassers, are applied to them. Those operating a railroad train do not owe the trespasser the duty to keep the train under control, to maintain a lookout for him, or to give signals or warnings of the approach of the train, or to take any precautions whatever for his safety, before his peril is seen and known by the ones operating the train. Brown's Admr. v. L. & N. R. R. Co., 97 Ky., 228; L. H. & St. L. R. R. Co. v. Wolfork, 30 R., 569; Prince v. I. C. R. R. Co., 30 R., 469; C. & O. Ry. Co. v. Barbour's Admr., 29 R., 339; Smith's Admr. v. I. C. R. R. Co., 28 R., 723; Flint v. I. C. R. R. Co., 28 R., 1; Beiser v. C. & O. Ry. Co., 29 R., 249; Curd's Admr. v. C., N. O. & T. P. Ry. Co., 163 Ky., 105; Fields v. L. & N. R. R. Co., 163 Ky., 673. It is insisted, in the instant case, that many persons for several years had been accustomed to use the bridge as a footway, and had done so with the knowledge and acquiescence of the railroad company. It is not alleged or contended that the railroad company ever consented to such use of it. Upon the other hand, the proof shows that its use by foot passengers was against the wish of the railroad. There was no walk way across the bridge suitable or constructed for travel by footmen. There was nothing in the construction or use of the bridge by the railroad company

which could be construed into an invitation to the public to use it as a highway. It has been held that people can not acquire the status of licensees by continuous trespassing in walking over a railroad bridge, and that mere acquiescence by the railroad can not be construed into a promise that the bridge might be used by foot passengers as a highway, so as to entitle them to lookout duty, or make them anything but trespassers. C. & O. Ry. Co. v. Barbour's Admr., *supra;* Curd's Admr. v. C., N. O. & T. P. Ry. Co., *supra;* L. H. & St. L. R. R. Co. v. Woolfork, *supra.* It could not, in the instant case, be said that the railroad company even acquiesced in the use of the bridge as a highway for footmen, because it had placed and maintained warnings to the public at each end of the bridge not to make such use of it. If a person had been injured by a train at the crossing between the bridge and the switch stand, or upon the track, along the street after the train passed over the bridge, and his injury was caused by the failure to give warning of the approach of the train or to maintain a lookout, there would be no doubt of the liability of appellant, as the injured person would have been at a place where he had a right to be, but the train did not come in contact with the decedent at such place, but upon the bridge, where he had no right to be, and where the appellant was not required to anticipate his presence or to take any precautions for his safety. Hence, appellee cannot rely for recovery upon the fact, if true, that no warnings of the approach of the train were given nor any lookout maintained, because not being required to take any such precautions for one trespassing upon the bridge the failure to do these things was not negligence, to which decedent's death could be attributed. Hence, there being no evidence which conduced to show that the ones operating the train saw or knew of decedent's peril, before or at the time the train came in contact with him, the action must necessarily fail.

Further, it is well settled that a recovery for injury on an allegation of negligence cannot be maintained upon the proof of the injury, alone, but there must be proof that the negligent act of another caused the injury, or there must be proof of facts from which the negligence can be inferred. "If the injury may as reasonably be attributed to a cause that will excuse a defendant, as to a cause that will subject it to liability, a recovery

cannot be had.'' Stuart's Admr. v. N. C. & St. L. Ry. Co., 146 Ky., 127. In the case at bar it can be surmised that decedent was walking upon the bridge, where he had no right to be, and was run upon by the train and killed; or that he had caught onto the train and was riding and fell from the car upon the bridge and was run over. From the facts in the record, one could fairly theorize that his death probably resulted in either of the manners suggested, but if his death resulted in either of the ways, the inference must be necessarily drawn that his death was attributable to his own negligence rather than to that of appellant. From the facts proven the inference cannot be drawn that those engaged in operating the train saw decedent in a position of peril before or at the time of his death.

For reasons indicated the court was in error in overruling the motion for a direct verdict.

The conclusions arrived at, are likewise, at variance with the instructions given in the case.

The judgment is reversed for proceedings consistent with this opinion.