## Cincinnati, N. O. & T. P. Ry. Co. v. Wallace's Administrator.

(Decided March 12, 1937.)

TYE, SILER, GILLIS & SILER for appellant.

R. L. POPE and G. W. HATFIELD for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

There is an unincorporated settlement, forming a very much scattered village in McCreary county, Ky., known as Flat Rock. There are, according to all the proof in the case, only between 20 and 25 houses of every kind and description throughout the village, and they are located on either side of the right of way of the appellant and defendant below, Cincinnati, New Orleans & Texas Pacific Railway Company, for a total distance along its tracks of more than one-half mile. Perhaps 90 per cent or more of the people who occupy the residence buildings are employees of the defendant. Some of the residences are section houses, while others are occupied by employees of defendant working in

other capacities. The other buildings forming the total number are small business houses, and defendant's depot. The largest number of people, all told, who reside in the settlement, or village, according to any witness is from 60 to 75.

The right of way of defendant, and the track thereon, run north and south and practically straight from a point south of the depot to a point north of it beyond a public road that crosses the track at right angles, while there is a country road crossing (but not a public road) just north of the depot, and the distance between it and the public road north of it is as much as, or more than, one-half mile. Along the distance between those two roads are located most of the houses in the village and they are practically evenly divided as to their location, i. e., about as many are located on the east side of the right of way as there are on its west side.

Some five or six rail lengths (a rail being 39 feet) south of the public road crossing and on the west side of defendant's right of way the appellee, Joe Wallace, and his wife and their son, about 19 years of age, resided. The front part of their residence is some 25 or 30 feet from the west line of the right of way, along which was a wire fence inclosing the right of way, as was also true along its east line. About opposite the Wallace residence, and on the east side of the right of way, was located the residence of a Mr. Renolds.

Some time during the day of July 12, 1935 (the hour not being shown, except that it was in daylight), Mrs. Wallace, who was 62 years of age, left her home, intending to cross the right of way and the four tracks thereon to the Renold's residence. Her husband was on the porch of their residence when she started and saw her go through a gate in the right of way fence, when he immediately went back into the house to get a drink of water, at which time he heard a train coming from the south on the northbound track, which was the extreme east one (the southbound track being the one immediately adjacent to it on the west) and which he said was making a noise like unto the "roaring of a storm." That noise was also proven by every witness appearing in the case. He then turned his attention toward his wife who was continuing her journey over and

across the railroad tracks, and when she was about to cross the east rail of the southbound track, he observed her turn her head south toward the approaching train. She then immediately increased her speed and succeeded in getting upon the northbound track and was in the act of stepping over its east rail when the train struck and injured her, from the effects of which she died eight days thereafter. He testified that when his wife looked to the south, as she was leaving the northbound track, and when she began to increase her speed, the train was then some five or six rail lengths south of her, and, according to his opinion, it was traveling something like 60 miles an hour. Other witnesses who were not experts, as was also true of Wallace, fixed the speed at about 50 miles per hour. The train was a manifest freight train, carrying a cargo of many cars loaded with fruit from the south to the north.

Plaintiff afterwards qualified as the administrator of the estate of his wife and filed this action against defendant to recover damages sustained to her estate because of her death, which he alleged was due to defendant's negligence through the failure of its agents and servants operating the train to observe certain enumerated requirements that the pleader concluded were enjoined upon them for the safety and protection of any one who might be using the right of way as a crossing at that point, as decedent was then doing. It was also alleged that at the place where she was injured there was, and had been for a number of years, a foot pathway over which pedestrians in crossing the right of way and tracks from one side to the other traveled. The alleged omitted requirements were, that the servants of defendant in charge of the movement of the train, failed to keep it under reasonable and proper control, or to maintain a look-out for pedestrians accustomed to cross the tracks at that point; that they failed to give the proper signals as they approached the path over which decedent was traveling; and that such failures on their part "co-operating, and co-ordinating and commingling the one with the other, were the direct, proximate and prime causes of her said injuries and consequent death," whereby her estate was damaged in the sum of $2,999, for which amount plaintiff prayed judgment.

Defendant's answer was a denial, coupled with a

plea of contributory negligence, the latter of which was controverted, and at the trial there was a verdict in favor of plaintiff for $1,000, upon which judgment was rendered. Defendant's motion for a new trial was overruled and it prosecutes this appeal, seeking a reversal upon a number of grounds, as alleged errors, chief among which are, (1) that the court erred in overruling defendant's motion for a peremptory instruction in its favor, made at the conclusion of plaintiff's testimony, and (2) error in the instructions given by the court on the motion of plaintiff's counsel over defendant's objections and exceptions. Defendant introduced no testimony, but consented, after its motion for a peremptory instruction was overruled, for the cause to be submitted to the jury, on that introduced by plaintiff. If ground (1) is sustainable, which we are clearly convinced is true, then it becomes unnecessary to discuss in detail ground (2). We will therefore first proceed to a discussion and determination of ground (1).

■ It would entail great labor to answer in detail all arguments of counsel for plaintiff in his efforts to sustain the judgment. He contends that the existence of the path across defendant's track at the place decedent was injured imposed the duty upon those operating defendant's trains to not only maintain a lookout on approaching it, but also to have defendant's train under such control, including speed, as to render it possible to avert injuring one who might be traveling the path, and that the conditions imposed the duty on such servants to give signals of the train's approach to such privately employed pathway, and he finally relies on the proposition that the fireman of defendant's engine on this particular train actually saw the peril of the decedent in time to have done something (but what particular thing could have been done counsel does not state) to have prevented the collision and consequent injury, and which is the invoking of the "last clear chance" doctrine. In arguing the latter point, counsel draws no distinction between the actual peril of the traveler (and later injured person), and where he is only in a position to become imperiled if he continues his course without interruption. Therefore, counsel argues that if any agent and servant in charge of defendant's train saw decedent traveling upon the path

at any point on defendant's right of way, the duty then arose to commence taking such steps as are required when persons are actually in peril, which latter situation is essential for the application of the "last clear chance" doctrine. The two situations are entirely distinct and are followed by entirely different duties imposed upon those operating the movement of trains.

There was no testimony in the case to prove that any of the defendant's tracks, throughout the long length of the village, were customarily used by any number of persons as a longitudinal passway to such an extent as to require the operators of trains to anticipate the presence of persons on the track and to take the required precautions for the safety of any one who might do so. That doctrine has become known as the "humanitarian rule" and counsel cites a number of cases sustaining, approving, and applying it, none of which are disputed by defendant's counsel, and all of which meet with our approval. But if this was a case upon which that doctrine was built (i. e., the use of the railroad track as a longitudinal footpath), then the cases sustaining it would not be applicable here, since the entire number of persons employing defendant's right of way as was the decedent on the instant occasion were not exceeding 40 or 50 persons each 24 hours, and no case can be found wherein this court has held that such limited use was sufficient to call for the application of that doctrine, as will be seen by consulting the cases cited in sec. 356, under the title, Railroads, in volume 16 of West's Kentucky Digest, one of which is that of Willis' Adm'x v. Louisville & N. R. Co., 164 Ky. 124, 175 S. W. 18, 21. In that case the same doctrine was invoked and the evidence as to the number of users of the track as a longitudinal pathway varied from 15 to 125 persons. In denying its application to the facts of the case, we said:

"But, if the number should be placed at 125, this would not be sufficient, under the conditions surrounding this territory, to convert these users into licensees, as it seems perfectly apparent, from the undisputed evidence as to the number of people in the territory adjacent to the railroad and around and about Benton and the residence of decedent, that it is not what would be called a populous community in the law controlling the subject. It also seems preposterous to say that as many

as 125 persons a day, in a community like this, would travel back and forth on the railroad track. It is, however, entirely probable that the few persons who lived near these tracks used them daily, or whenever they wanted to go any place; but so do people all over the state who live near railroad tracks in the country use them as highways. The persons who use these tracks seem to think they have the right to do so, although they cannot help knowing how dangerous it is, and that they take their lives in their hands every time they put foot on a railroad track in the country where many trains are running at high speed and under no general duty to keep a lookout for or give warning to trespassers.''

The excerpt was supported by Judge Carroll (who wrote the opinion for this court) by a number of prior cases to the same effect, some, if not all of which contain facts much more strongly supporting plaintiff's contention than do the facts in this case support that of counsel for plaintiff herein. The sustaining cases so cited therein are Gregory v. Louisville & N. R. Co., 79 S. W. 238, 25 Ky. Law Rep. 1986; Adkins' Adm'r v. Big Sandy & Cumberland Railroad Company, 147 Ky. 30, 143 S. W. 764; Chesapeake & O. R. Co. v. Nipp's Adm'x, 125 Ky. 49, 100 S. W. 246, 30 Ky. Law Rep. 1131, and Corder's Adm'r v. Cincinnati, N. O. & T. P. R. Co., 155 Ky. 536, 159 S. W. 1144. Later ones following the holding in the Willis opinion and expressly quoting from and aproving it are Henson's Adm'r v. Hines, Director General, 193 Ky. 198, 235 S. W. 359, Chesapeake & O. R. Co. v. McMath's Adm'r, 198 Ky. 390, 248 S. W. 1051, and Lawson v. Louisville & N. R. Co., 213 Ky. 767, 281 S. W. 994. Others following the last one, to the same effect, might be cited, and the opinions referred to contain still others of like tenor.

But, if the doctrine were applicable to the facts of this case, then the proven facts would not authorize a recovery, as we will now proceed to point out. Numerous are the cases (with none to the contrary) to the effect that the object of signals is to impart notice to the person endangered of the approach of the train. But when such a one is shown to already possess that notice, the failure to signal will not give rise to a cause of action or support a charge of negligence based on such omission, for the manifest reason that the one

for whose benefit the signals are required already possesses the knowledge that the signals were intended to impart, thereby fulfilling the purpose of such signal-giving requirements. Plaintiff himself (the husband of the deceased) testified to the fact of his wife looking in the direction of the approach of the train when she was at a place of safety; but which approach she did not heed, but continued straight on with increased speed, and which clearly establishes her conclusion that she could safely cross the track before the train overtook her and her determination to undertake it, but in which she was mistaken. She was not "in peril" until she got upon the track, or until it became clearly apparent to those in charge of the train that she was heedless of its approach, and, perhaps, unaware thereof, and that she was then so engaged or so acting as to clearly indicate a determination to cross the track in front of the train and not to stop and await its passing. When such situations are presented, then the doctrine of the "last clear chance" arises, and it becomes the duty of those operating the train, in such circumstances and conditions, to perform all acts within their power—with the means at hand—to prevent or avert the injury. But, until such peril arises, the operators of the train have the right to believe that the one who is only potentially approaching danger will desist from his course and avert it before actual peril is created, and which desisting, ordinary prudence on his part requires and demands.

Supporting the latter expressed view are the cases of Louisville & N. R. Co. v. Gilmore's Adm'r, 131 Ky. 132, 109 S. W. 321, 322, 33 Ky. Law Rep. 74, 21 L. R. A. (N. S.) 723, Ford's Adm'r v. Paducah City Railway, 124 Ky. 488, 99 S. W. 355, 30 Ky. Law Rep. 644, 8 L. R. A. (N. S.) 1093, 124 Am. St. Rep. 412, and Johnson's Adm'r v. Louisville & N. R. Co., 91 Ky. 651, 25 S. W. 754. A case denying the invoked doctrine herein of lookout duty, etc., as defendant's train approached the path that decedent was traveling and rejecting its application under similar facts, is that of Helton's Adm'r v. Chesapeake & O. R. Co., 157 Ky. 380, 163 S. W. 224.

In view of the law, as so declared in the cited cases, and many others that could be cited, the acts of negligence relied on in this case are unavailable to plaintiff, since his decedent, with knowledge of the

situation, and of all the facts, abandoned her place of safety and suddenly imperiled her life by going almost immediately in front of a rapidly approaching freight train which could turn neither to the right nor to the left, but was compelled to proceed on the rails of the track as they were constructed, and which facts were also known by her.

A reading of the cases dealing with the questions here involved will thoroughly demonstrate that each one must be determined upon its own facts, there being no fixed and unalterable formulated rule applicable to all of them in their varied and complicated facts. In this case, according to the proof, decedent's peril as hereinbefore described, first became manifest to the operating servants when the train was only five or six rails from her and approaching at a high, but not unlawful, rate of speed. Alarm signals were immediately sounded, but the time was too short for the employment of any other means that would have been of the slightest service in preventing the collision.

The law has rightfully been so declared by statute and judicial decisions as to exact of railroad companies, in the operation of their trains, many duties for the protection of the members of the public who might become endangered thereby—even to the extent of creating and applying the ''last clear chance'' doctrine; but neither it nor any other duty imposed upon the operators of trains have gone to the extent of making railroad companies insurers against accidents, nor have all the requirements combined resulted in making them guarantee protectors of the lives and limbs of those, who, under any and all circumstances, place themselves in the fixed path of their moving trains. There are still some duties imposed on the injured person, the observance of which may not be dispensed with by even the ''last clear chance'' doctrine. We deem further discussion unnecessary, since the facts proven in this case, in the last analysis, furnish but one ground upon which the action could possibly be based and which is the ''last clear chance'' doctrine, and the testimony shows that it is not available to plaintiff for the reasons hereinbefore pointed out.

■ We would have no trouble in pointing out material errors in the instructions given by the court,

but since we have determined that a peremptory instruction on behalf of the defendant should have been given, it becomes unnecessary to lengthen the opinion with that labor.

Wherefore, for the reasons stated, the judgment is reversed with directions to set it aside, and to sustain the defendant's motion for a new trial, and for other proceedings consistent with this opinion.