## Happy Coal Co. v. Garrison.

(Decided Dec. 17, 1937.)

CRAFT & STANFILL for appellant.

C. A. NOBLE for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Reversing.

Appellee sought recovery of the Louisville & Nashville Railroad Company and the Happy Coal Company, a mining company, for an injury resulting from an accident occurring on appellant's properties November 17, 1930. The railroad company operated a branch road running east and west, directly through the mining camp of appellant. Running parallel for some distance with the main track is a switch which connects with the main. A roadway leading from the main highway, running almost north and south, through the mining camp, crosses the main and switch tracks (40 feet distant from each other) at right angles.

Appellee's petition alleged that the railroad company owned and operated the main, switch and side track, "and that a crossing was maintained across said tracks at said place"; that the appellant was loading coal at the time on the side track of the Louisville & Nashville, "and while this plaintiff was crossing the track of the defendant upon said crossing, the defendant by its agents and servants, carelessly and with gross negligence ran one of the railroad company's cars upon its track upon and over him causing the injury." Defendants' demurrers to the petition being overruled, they answered separately, denying allegations of the petition, and affirmatively pleading contributory negligence. A reply controverting this affirmative plea completed the issue.

At the conclusion of appellee's proof the court sustained the railroad company's motion for a peremptory instruction. After completion of all proof, the court overruled appellant's similar motion, and instructed the jury, which returned a verdict for plaintiff for $1,500. Judgment was entered on the verdict, and the coal company appeals.

It is argued: (1) The appellee at the time of the accident was either a trespasser, or at most a licensee upon the crossing, hence appellant owed him only a duty not to injure him wantonly or willfully. (2) After discovering the perilous situation of plaintiff, defendant, by its servants, used every means at command to avoid injury to him; therefore, under the facts the court should have sustained appellant's motion for a directed verdict.

The undisputed proof shows that the switch track was solely owned and operated at the time by appellant. It was used for the purpose of having the railroad company set in empty cars, to be taken by appellant up to its tipple. The car which caused appellee's injury had been set in on the east end of the switch. On the north side of the tracks are located the office and other company buildings, and a number of houses occupied by employees. South of the tracks are located the mine, the tipple, and a number of houses also occupied by employees. This whole property is referred to in the record as the "Camp." State highway No. 15 runs north of the tracks; between the highway and the buildings on the north side is Beaver creek, and at a point near the highway is a bridge on appellant's property, which connected the road leading from the highway through the camp, across the tracks southwardly to the mine. This roadway is said by appellee to be a public road, and the crossing a public one; but appellant claims otherwise.

On the south side of the switch track, where appellant's tipple is located, appellant operated a hoist, used for pulling the empty cars up a 4.183 per cent. grade from a level below the crossing. The hoist was operated by an electric motor, which, as best we can gather from the record, was 40 feet, and the drum or sheave about 140 feet, west of the crossing. At a point about 90 feet west of the crossing is the peak of the grade, which is called a "knuckle." The tipple is further west beyond the knuckle. The operation employed in hoisting a car consisted in taking the loose end of a cable, which ran over the pulley and hitching it to some part of the car, whereupon the motor was started and the cable running over the pulley, farther up the grade, wound around the drum at the hoist, drawing the empty car over the knuckle; there the cable was released, allowing the movement of the car down grade on to the tipple.

Four men were engaged in the movement of cars as described at this time; one operating the motor; one at the sheave; one who handled the cable; and a brakeman on the rear end of the car. On this particular day the operators had hoisted six or seven cars over the knuckle, without any trouble, in the manner described. On the day of the accident appellee, a man about fifty-five years of age, had agreed with one Spurlock to haul

some corn. Spurlock had formerly been an employee of appellant, living on the hill on the south side of the tracks, and under his contract was allowed to cultivate some of the company's land. He had raised a crop of corn, but had severed his connection with appellant some months prior to November 17, and moved, leaving the corn, which he later sold to one Combs, who lived on the highway. Appellee was to deliver the corn to Combs, and some time in the afternoon started to the cornfield, driving a mule hitched to a sled.

It may be well to state at this point that the person operating the hoisting devices had hitched the cable to the truck of the 40-foot railroad car, and were pulling it past the crossing as appellee approached. We shall give appellee's version of the accident, though it is related in such a way as not to appear clear in detail:

"I had two fellows helping me and before I got ready to cross they hitched onto the cars and started up the hill. I waited till the cars got past and about two-thirds of the way up the hill before I started on across. I had no idea it was coming back and I was in a hurry to keep up with the boys on ahead of me and I got across the track and on to the side track. And * * * the cross-ties stuck out and the rails was still higher, and my sled edged in against the rails and got fastened. I hollered 'whoa' at my mule and she kept pulling at it. I reckon she thought she had to try to pull out, and I tried to jerk the sled loose and couldn't. Then I took hold of the lines and headed her back in the road and she moved her head around and stood there. I went around on the right side of the mule and took hold of her chin and tried to pull her down the track and that put my back next to the cars, and while I was pulling at her and again I got her turned around, and I looked and the car was right in my face. I slapped my hand on the mule and as I went back the mule was shoved against me and I stumbled and fell and the mule coming after me, and she had me down about here on my feet, and the next I realized I was between the rail, my back next to the foot of her I got my hips up and by that time she was down on them. I shoved my shoulder up and barely cleared them; then I tried to get my arm loose, but it was caught tight. The way the mule fell my legs was against the hames and when

I shoved my shoulders out, my head was still on the railroad track. I shoved the mule over till I could get my head off of the rail but my arm was still on it and when I got it down it broke my arm off.''

On cross-examination appellant was asked:

"At the time you were injured, did you see this car coming back?" and he answered; "Yes, but I didn't have time to get out of the way. The car stopped when it hit the mule, but not until it crowded her down on me, it didn't stop."

Following the injury, appellee's arm was amputated near the elbow.

Appellee introduced as a witness one of the employees of the company, who explained, as we have tried to above, the details of the hoisting operation. This witness was the "motor man." He did not see the car strike appellee, but saw him just before. He says that, after the car started back, appellee got off the track, and then got on again. The cable or rope man said that when he hooked on to the empty he at once got on the "stirrup" at the rear end of the car. After the car had pulled some 15 or 20 feet, the rope came off the pulley and the car started back. He had seen appellee between the two tracks and on the switch. As the car started back, he called "look out," and appellee got off the side track, but got back on. "He tried to clear himself. He was trying to get the mule off the track. The brakeman started to working the brakes as fast as he could; the brakes held and the car stopped." This witness says that, as they were carrying appellee to the commissary, the brakeman said: "We done everything we could," and appellee answered, "I stayed a little too long trying to save my mule."

Another witness says the same, but appellee denies making such statement, and says he had no warning of any kind. The brakeman said that he realized that the cable had slipped, and "I tightened the brake as quick as I could." This witness saw appellee trying to get the mule across the track before the car started back. "I told him to get out of the way, and he got off and then got back in the middle of the track when I was applying the brake."

That the "cable slipped" is the only proof offered by appellant as to negligence. Why, or in what manner,

or what caused it to leave the pulley, was not attempted to be shown. Appellant proved that the hoist was working all right.

Much of the proof introduced went to the question of whether or not this particular crossing was a public or private crossing. Appellee undertakes to show that it was public, but the effect of the testimony on this subject showed a use, not by the public generally, but by the employees of appellant, and their families. Appellee says he had used it once or twice before in moving in or out the household goods of employees, and frequently in delivering papers to the employees living south of the tracks. It was also sought to show that it was public, because the bridge over Carr's Fork near and leading to the highway was in part paid for by the County Board of Education. The board did contribute to its building, but it is not shown that the board, county, or state exercised any control over it. The road was marked "Private Road," and the testimony amply shows that it was built and maintained, not for the use of the public, but for the sole use of appellant, and was so used by it and its employees. After reading the proof closely on this point, we are of the opinion that in no sense of the term was the crossing in question a public one.

It is manifest to us, reviewing the whole record, that the case was practiced on the theory that the crossing was a railroad crossing, that is, a point where a carrier's tracks crossed a public passway, and which, if it were so, would require a high degree of care on the part of the carrier when approaching the roadway, i. e., ringing a bell or sounding a whistle, and proceeding with caution, sometimes being required to keep a "lookout." This is not such a case. The railroad company, as far as the proof shows, did not own the switch; they did not hold the right of way; they were not required to maintain this particular crossing. It was not moving one of its cars over it, and were properly exonerated by the court on proof introduced by appellee, and of this exoneration he is not here complaining. Under this state of facts we are to ascertain the question of relation of appellee to appellant at the time of the accident, and thus determine the duty owed to appellee by appellant.

As is said in brief, appellee was either a trespasser or a licensee. If he was a trespasser appellant, on the

occasion of his injury, owed him no duty except to exercise ordinary care with means at its command to prevent injury to him after his peril was known. Louisville & Nashville Railroad Co. v. Dooley's Adm'r, 200 Ky. 67, 294 S. W. 810; Howard v. Illinois Cent. Railway Company, 189 Ky. 60, 224 S. W. 635, and the late cases of Cincinnati, N. O. & T. P. R. Co. v. Wallace's Adm'r, 267 Ky. 661, 103 S. W. (2d) 91. If appellee was a licensee, he took the premises as he found them and appellant owed him no duty except to refrain from any positive act of negligence which suddenly created a hazard to him. We reviewed the above cited cases in Louisville & N. R. Co. v. Snow's Adm'r, 235 Ky. 211, 30 S. W. (2d) 885, 888, in which we said:

"As pointed out in the cases cited above the owner or occupier of land owes a more limited duty to a mere licensee than he does to an invitee. * * * The distinction is generally stated to be that invitation is inferred where there is a common or mutual advantage, while license is inferred where the object is the mere pleasure or benefit of the person using it. Sage's Adm'r v. Creech Coal Company, [supra], 194 Ky. 415, 240 S. W. 42, 44; * * * Rabe v. C. & O. R. R. Co., 190 Ky. 255, 227 S. W. 166, 16 A. L. R. 1052."

In the Sage Case, supra, which is fittingly applicable here, this court classified the complainant as a licensee, under the facts as therein developed, saying that:

"He was not an 'invitee,' as that term is ordinarily employed, is clear, since he was on the defendant's premises for purposes of his own, and not for any purpose connected with the company's business or beneficial to it."

Under the facts as developed, we conclude that appellee's relative position was no greater than that of a licensee. Bridgford v. Stewart Dry Goods Company, 191 Ky. 557, 231 S. W. 22; Leonard v. Enterprise Realty Company, 187 Ky. 578, 219 S. W. 1066, 10 A. L. R. 238. The fact that appellant did not prohibit persons from using the crossing over its switch track would not, due to this fact alone, constitute persons using it as invitees. Chesapeake & O. Railway Company v. Stephens' Adm'r, 168 Ky. 775, 182 S. W. 938. The argument is

158

made that, because appellant was hauling corn which a former tenant, long after abandoning the premises, had sold to a neighbor, made him an invitee, is not logical. The former tenant would not have been, were he then engaged in hauling the sold corn, an invitee.

As we view the proof, appellant owed appellee the duty to exercise ordinary care to discover peril, and in the exercise of such care to use all means at its command to prevent injury. Cumberland Railroad Company v. Walton, 166 Ky. 371, 179 S. W. 245. Such an instruction was offered by appellant and its giving refused. This was error. Appellant insists that, since the proof shows that its servants used all means at its command, it should have had a peremptory instruction. Appellee's conflicting testimony was sufficient to authorize the court to submit upon this issue. Opinion on other questions discussed reserved.

Judgment reversed, with directions to grant appellant a new trial consistent with the foregoing.